Ms. Rogers for Appellant Dom, Mr. Morrissey for Appellant Imam Pasha, Mr. Allen for Appellant Daaiyah Pasha, and Ms. Heller for the appellees. Good afternoon. The court will make just a brief statement in connection with the denial of Appellant Dom's counsel's motion to seal the courtroom. There is a strong presumption in favor of public access to court proceedings. There are only limited circumstances for sealing a courtroom. The motion to seal did not discuss the relevant precedent. The motion also did not identify the type of confidential or sensitive medical information that would require closing the courtroom. The members of this court are familiar with the medical issues referenced in Appellant Dom's pre-sentence report, which is part of the sealed materials. During oral argument, the sealed medical issues may simply be referred to as such. Thank you. All right. Good afternoon. Hi. May it please the court, my name is Megan Rogers, and I represent the appellant, Mr. Dom. Mr. Dom's convictions must be reversed or, in the alternative, vacated and remanded for three reasons. The first issue concerns the validity of Mr. Dom's jury waiver. Here, we respectfully argue that where there is evidence of mental illness and an absence of an oral colloquy, a new trial is warranted. What does Rule 23 require? Rule 23 requires that the submission be in writing, that the government consent, that the court consent, but beyond that, in addition to a Rule 23 waiver, the waiver But let's start there. That's what Rule 23 requires. Yes. Were those conditions met in this case for each of the defendants? The Rule 23a waiver was properly submitted, yes. Right. Okay. But the Rule 23a waiver alone isn't sufficient to waive a right to a jury trial. In addition to that, the defendant must be competent to waive his right to a jury trial, and the waiver must be made knowingly, intelligently, and competently. Is a colloquy required? In certain circuits, it is, yes. In this circuit, Your Honor, no, there's no supervisory rule, but it's certainly been encouraged, for example, in David. And the reason for that, I think, is simple. It's that intelligence does not equal competence. People suffering from mental health issues often make decisions that don't seem to comport with their intelligence. This Court need look no further than judge-friendly suicide. I think the language of the case is something like a red flag. There needs to be a red flag that the judge needs to have some reason to think that the person may not be competent. What did the district court have in front of her at the time that would have been a red flag to her that perhaps competency was not before her? At the time that the district court received the written waiver, there was nothing in front of it indicating that Mr. Dong suffered from mental illness. But I think, Your Honor, that this only underscores the importance of conducting this type of colloquy. But then the suggestion is, if there's nothing in front of the judge, that she needs to engage in colloquy every time. But that's not what the rule requires, and that's not what our case law requires. The law requires that the district court has a responsibility to evaluate the mental ability of a defendant to evaluate. And if there's nothing in front of her to suggest that there's a problem there, I'm not certain what rule you want. I am certain what rule you want us to adopt, and I just don't know the basis for it. Colloquy every time. Again, this Court doesn't need to conclude that a colloquy is required in every instance. But here, where there's evidence of mental illness, and there is no— That's what I'm getting at. What was the evidence of mental illness before Judge Kessler? There was nothing before Judge Kessler at the time, but this Court can take a de novo review of this issue. And looking at all of the evidence in this case, Mr. Dahn was suffering from mental health issues for over a year before he waived his right to a jury trial. Is there any suggestion that they affected his competency? This is a seasoned litigator, right? This is someone who had been in court many, many times. Is there any suggestion that he was incapable of understanding something that's significant but fairly routine? There's simply no evidence one way or the other because the questions weren't asked. You know, the bench book encourages district courts to ask fairly simple questions, such as, Have you taken any medication today? Are you under the care of a psychiatrist? Any of those questions would have reached— There's no question those are best practices, but the issue before us isn't best practices, right? The issue before us is constitutional rights or statutory rights. And there is no law that says that sort of colloquy is required, right? It's a fundamental— In the absence of a red flag. That's what I'm troubled by in your argument. So in this case, what the judge had before her was a seasoned defense attorney and an attorney who was represented by counsel. And neither said anything or submitted anything in writing to the district court. That's correct, Your Honor. And so the only way you can prevail under this theory is if we adopt the rule that Judge Griffith has suggested your argument at least implies, namely that in every instance in which there is a waiver, purported waiver, of a right to a jury trial, the district court, sua sponte, must engage in a series of questions. And what those questions are will be litigated ad infinitum. But you're basically saying there must be a Rule 11 inquiry. No, Your Honor. That's not our position. In fact, I don't think the court needs to reach that conclusion to find it in our favor here today. In our particular case, you know, these issues need to be evaluated based on the facts of the case in front of the court. And here there is evidence of mental illness. There is an absence of an oral colloquy. And on those facts. Let me say, based on my familiarity with the record, which is probably not as complete as yours, I'm not sure even that has been demonstrated. There is no medical evidence, per se, in the record. And you want us to make a ruling on the basis of this record, which I'm suggesting to you is thin at best, that there must be a colloquy in every case. Your Honor, I think in this case, I mean, there is evidence in the record that he was suffering from panic attacks. And I know I listened to Your Honor's announcement at the beginning that we should refer to it generally. But I want to clarify what's in the record for the purposes of this case. We are familiar with it. Okay. On this basis, I think that there is an insufficient basis on which this court can judge the validity of the waiver. We're not asking for a blanket rule that in every circumstance a court has to conduct an oral colloquy. And sometimes it might. But why not, counsel? Isn't that the implication? There was nothing you acknowledged before the district court to indicate any reason to doubt your client's competence to stand trial. And no counsel made that point at the time. We would certainly support such a supervisory rule that's been adopted in the Seventh Circuit. But it's not necessary for this particular case. As in David, there's an insufficient basis on which this court can judge the validity of Mr. Dahm's jury waiver. Taking a de novo approach. Maybe I'm missing something, but I still don't get it. So I'm imagining we're in the district court, right? Yes. What was there about the proceeding that would give the district court some notice that there was a problem? The lawyer said nothing about it, right? Said nothing about it. There's nothing from Mr. Dahm's conduct that would suggest that there was a problem here. Am I right that it wasn't until the sentencing hearing that this issue was even raised? That's right, Your Honor. So help me that. So you're the district court. We're trying to figure out what's the right way for the district court to act. Total compliance with Rule 23 is, in this instance, inadequate. Therefore, I'm going to engage in a colloquy. What was there? What was there in front of her that should have triggered that? There was nothing in front of her, but the point is that a Rule 23a waiver alone isn't sufficient to waive a right to a jury trial. The district court has a responsibility to determine whether that waiver is being made voluntarily, intelligently, knowingly. So you're telling us that the rule should be for district court judges. We're going to reverse this case. And in the future, you don't have to do a colloquy all the time. But if it turns out after the fact that you don't do the colloquy and there's something that you didn't know about and that the lawyers didn't tell you about, you could still get reversed again. I think this court could hold consistent with its decision in David that we strongly encourage district courts to always conduct an oral colloquy because there's every reason to conduct one and no reason not to. And in this particular instance, where there's evidence of mental illness that we find in the record and there's an absence of an oral colloquy, there's just an insufficient basis to judge the validity. But David was a case where there were all kinds of red flags for the district court, and that's one of the reasons why there was a reversal or a remand in that case. And there's no red flag here. The same principle still applies, Your Honor. It's a responsibility of the district court. It shouldn't be delegated to the lawyers. The burden is properly placed on the district court to evaluate. The implication of our questions, I think, is that any defendant who was convicted could likely make the same argument based on the same type of medical evidence that's in this record. It's certainly possible, Your Honor. But I think it's the same argument that the government's making to a certain extent. It's relying on this image of a cunning defendant who's trying to game the system. But relying on that image fails to protect defendants who are suffering from real mental health issues that affect their ability to make important decisions. And it's far better in this case to place the burden on the district court and on the government to conduct the simple oral colloquy. So can you imagine if you were a district after a ruling like you're asking for, can you imagine any circumstance under which a district court judge would not engage in the colloquy? Would choose not to? Yeah, would choose not to. I would hope that every district court would engage in an oral colloquy. And that's beyond the rule, right? The rule doesn't require that. This Court encourages that, strongly encourages that. But there's a difference between encouraging and making it the law, right? That's correct. That's right. So what you're asking is that we take a best practice and change the law. Congress hasn't seen fit to do that, but you, Court of Appeals, go ahead and do that. That's something we're quite reluctant to do. Again, I don't think that this Court needs to make that blanket rule. It could limit its work. But I haven't, I don't understand, no, I'm sorry, I must be missing something about your argument. Because you're arguing for just that blanket rule. You're telling us, as I understand it, that when a district court judge has no evidence whatsoever that there may be any problem with the competency of the defendant, and the defendant's attorneys say nothing about it, that under that circumstance a district court judge must engage in a colloquy to discover if there's a mental health problem. That is a significant amendment of the rule. And maybe it's a good one. But typically we'd say take those good ideas to Congress. They're the ones that sets these rules. Our position is simply that where there's evidence of mental illness and the absence of an oral colloquy, a new trial is required. Yes, Your Honor. That's precisely the reason that district courts should conduct this inquiry in the first instance. Okay. Let me ask the question a different way. If we have held previously that a colloquy isn't ordered every time, then how can this panel rule in your fashion rather than the en banc court having to do so? Because, I mean, hasn't your argument effectively been rejected in holding to this court in David and or in Lawson? I think our argument is entirely consistent with David, which is that, you know, we're going to – we're not going to impose a supervisory rule at this point because we don't find it necessary, but we strongly encourage district courts to conduct this colloquy. And on the record in front of us, there's an insufficient basis to determine the validity of that waiver. And I see I'm out of time. I still have two arguments, but I'm happy to address them on rebuttal unless this court has further questions. What are the other two that you want to address on rebuttal? The second issue that I want to address is that the district court effectively read the word corruptly out of the obstruction of justice statute. And what's the third? The third is that it relates to the subordination of perjury convictions. And here we're arguing that subordination of perjury has been interpreted to require that a defendant knowingly and willfully induce perjury. And these are issues that were never raised in the district court? That's correct, Your Honor. All right. Thank you. Thank you. All right. Counsel for Appellant Dayao? Pasha? With apologies on the pronunciation. Good afternoon. May it please the Court, Brian Morrissey for Appellant Daman Pasha. If I might continue the discussion on the Sixth Amendment standard and accepting that rule that I agree that under David and this Court's precedence, red flags are required on the record to trigger a need for a colloquy. We would submit that in Iman's case there were three. The first was that this was a multi-defendant trial with several unique aspects. The second is that the waiver forms that were submitted were submitted and apparently prepared by the attorney for just one defendant. And the third is the complete silence on the record in this case from Iman Pasha's attorney. And we think that distinguishes this case from some others. Was there any objection by Iman's attorney? There was not. Was the attorney present at all the critical moments? She was present at the sole courtroom discussion of the waiver issue, but what's a little bit different about this case than others is that that courtroom discussion didn't involve the final relinquishment of the right. We would submit that it was an unambiguously preliminary discussion about a possible future waiver. And what was said to summarize that discussion? Sure. So the other two co-defendants' counsels got up and informed the district court that they expected that all defendants would be waiving their jury rights. But wasn't there some discussion that it was a tough call? There had been lots of conversation back and forth. That's true. Which suggests it was considered in detail by competent defendants. We'd submit it to be ambiguous. They said back and forth whether that means there was indecision or disagreement, but the other defendants' attorneys said back and forth. But it wasn't done hastily, right? I mean, you can't read from that that somehow the decision was made hastily. There was a lot to this, right? It's unclear. The phrase from co-defendants' counsel was there's been a lot of back and forth about this, and we expect that all defendants will be waiving the right. The district court took that information and indicated that she had never been apprised that that was a possibility, and the government hadn't either. And so the conversation ended with the government receiving a few days to think about it and the district court then proceeding to read her jury selection procedures, apparently on the expectation that there was still some real chance that the case would go forward to a jury. So we would submit that that would have been an inappropriate time for Iman to stand up and interject and object. The next time that the defendants are in the courtroom, it's opening statements. So we think that's a different case than some of the others from other circuits where the defendant sits silently by while her own counsel fully and unambiguously waives her right to the district court. That wasn't the case here. Iman's counsel never spoke at all. Another important thing we think about this multi-defendant trial is that you had Iman on trial with two individuals with fairly powerful influence over her, her boss and her mother. We think under Gordon. Remind me, how old is Ms. Posh? She's in her 30s, so she's just certainly not a minor. But how long has she been involved in the criminal justice system professionally? Professionally, I think close to a decade at that point. There's nothing in the record how familiar she was with courtroom procedure, however, even though she was certainly working for a criminal defense attorney. This Court's decisions in David and Gordon talk about the fact that advice on the technical distinction between a bench and a jury trial isn't sufficient, that advice that comes, a waiver that comes from misinformation or incomplete information from counsel can be reversible error. And we think in this multi-defendant trial context, particularly with Iman on trial with her boss and her mother, there were two questions that a colleague could have answered and should have answered. The first was whether Iman understood that she couldn't be outvoted on this question by those two individuals. And the second was whether she understood that she could retain her jury right without impairing her interests. Now, I understand all of this if I were sitting as the district court, but now we're on appeal, and none of this was mentioned to the district court, and it sounds like, you know, the fact that counsel didn't say, I agree, on that basis, you're seeking reversal. Let me just clarify for the record, because my list has you arguing third, but you are representing Iman Pasha. Is that correct? That's correct, and I apologize. All right, so let's just correct the record on that. Thank you. That is correct, Your Honor, and I apologize to the court. No, it's not your fault. I just want to be clear. Counsel, you heard me stumble over the name, and be sure to alert the judge who you represent. I apologize for that. All right, so in any event, she's been in the system for 10 years. She's an investigator. She works for an attorney. She was represented by her own attorney, and no one here has made any allegations about ineffective assistance of counsel. That's right. And we ought to read all these factors in. I mean, multi-defendant trials happen every day. That's certainly true. That can't be one basis for reversal. No, but I think... She's not a stranger to the criminal justice system. There's no indication that she suffers from any mental defect or is slow mentally. Right. Although this Court's presidents have reversed convictions on inappropriate waivers without evidence of mental health issues. No, I agree, but I'm just trying to understand what counsel are asking us to do. These trials go on every day. Counsel know how to make objections to the district court. The district court knows how to respond. Here, everybody's quiet. Right. And then they come to the Court of Appeals and want everything reversed. That's what I'm getting at. Sure. And I think this is a case where, as you note, everyone was quiet at the trial stage, much like the Gordon case where the waiver occurred based on what this Court described as misinformation from the attorney that could have been resolved in a college case. And that's why I mentioned no one has even hinted at ineffective assistance of counsel. So we're faced with a situation where the client is fully satisfied with her attorney. There's no suggestion that the attorney did not do what he or she was supposed to do in properly advising your client. And yet we should still reverse. That's what you're asking. Because it was a multi-defendant trial. It was a multi-defendant trial. There's a question that it's a situation where this defendant's attorney was never engaged in any discussion with the district court, which we would submit is unusual compared with other cases. And why wasn't he? I mean, was there something about the proceeding that forbade him from being engaged? I think there's two reasons. One, other attorneys' counsel were speaking at the time. And second, I was an attorney. I was involved in plenty of multi-party litigation. And it would just be absurd if I had told the client, sorry, there were just so many lawyers there.  That might be ineffective assistance of counsel. And as Judge Rogers pointed out, there's no hint of that at all. So the mere fact that there were a couple of other lawyers there and her lawyer chose not to speak, somehow that's a red flag that that's. I think it is a red flag when it's not the final. There's no indication from that discussion that it would be the last time the court was taking up this issue. That discussion ends in a very preliminary state where the government's going to go back and think about it and the district court discusses then her jury selection procedure. So we think it would have been the wrong moment for the client to interject. All right. Anything further? Thank you. All right. Let's see. Counsel Allen for Appellant Diasha Pasha. Thank you, Your Honor. May it please the court, when Allen on behalf of Appellant Diasha Pasha, I would reserve one minute for rebuttal. The district court's fundamental error with respect to Ms. Pasha was failing to separately evaluate the evidence against Diasha specifically and instead unfairly lumping her together with the other defendants in this case. The overwhelming majority of the evidence cited in the district court's opinion had nothing to do with Diasha Pasha. Who identified her as being part of this Valentine's Day party? Who says she was there? In the district court's opinion, the district court identified two witnesses who identified Diasha Pasha being present for the photo shoot. One was Jerome White and one was Candace Robertson. And who said she was not there? That's Brittany McDaniels, a friend of Ms. Robertson's, I believe, who was also present at the photo shoot and who when specifically asked on cross-examination to look at Ms. Pasha and say was she there, she said she was not the investigator she saw. Yeah, and Jerome and Candace's testimony, if I'm getting this right, wasn't restricted simply to her appearance at the Valentine's Day shoot, right? It was not. What else did they say? They testified to a number of different facts. But if you're asking what else did they testify to with respect to Diasha Pasha? Just Diasha. They identified her as being present at a planning meeting that happened the morning of the photo shoot. Right. Mr. White's testimony was actually particularly telling on that because he originally testified that Ms. Pasha was there. Then he said, well, I can't remember who was there, but an investigator was there. And then he said, I can't remember if the investigators were in the upstairs room where these discussions about the conspiracy were happening. Yeah. So I think the district court didn't cite any of the planning meeting testimony in her opinion. Is this your sufficiency argument or your Brady argument? This is my sufficiency argument, Your Honor. In the district court, how did she describe her reasoning when she had conflicting testimony between, none of them were characters who were particularly savory, right? Or had particularly good track records when it came to credibility, right? Yet her determination is based on credibility, right? She made that very clear. She did. That she's making a credibility determination. She did. And she gave a number of reasons for that. Yeah. And I think it's important to look at those reasons because when you look at them, none of them pertain to Diasha. Okay. Now once again, I'm setting this up because obviously we're in a realm where all of a much less keen, right? Because we're told credibility determinations are to be made by the trier of fact and we're not triers of fact. That's true. But in this situation... So you've got a big... If you're going to take her on a credibility, you've got a big hill to climb. Well, I think it would be almost harder in a jury case where you're looking at a black box. Here we have a 29-page verdict opinion from Judge Kessler where she outlines the reasons she gave for why she found these particular witnesses credible on a certain issue. And you think that her reasoning is flawed? Well, I think her reasoning, when looked at specifically with respect to Diasha, does not point to anything that would lend credence to the testimony of otherwise incredible witnesses. For example, on JAA's... Now, we've got a problem here in that we're dealing with... We don't have any credible witnesses out there, but this is a rogues gallery of sorts. Well, with respect, there were some witnesses the district court credited. Yeah, yeah. But I think credited, but I'm saying we're talking about people, anyone of whom could be attacked on cross-examination by any attorney, right? I mean, we don't have the 12 priests or whatever the phrase is. Correct, Justice Griffiths, but that's why Judge Kessler thought appropriately so, thought it was important to look to, quote, independent evidence that strongly bolstered the government's case. And when you look at that independent evidence with respect to Diasha, none of that implicates her in this case. It might say something about Mr. Dahm or some of the other defendants, but when you look at her specifically, none of that evidence implicates her. Of the thousands of telephone call records that the government has between the witnesses in this case, which Justice Kessler cited, none mentions Daya Pasha by name or captures her voice. None of the jail logs produced in this case records Daya's name or mentions her visiting any of the key players in the conspiracy below. And the government produced no other documentary or independent evidence to support. Health counsel, the standard for having us reject the testimony of a witness as incredible as a matter of law is very high. And I would submit that I don't know of any case where it's actually been met. And there were at least a couple of witnesses that placed your client at the party. So that's going to be an uphill mountain for you to climb. Judge Wilkins, I would say- If you've got something to say about your Brady argument, I'd like to hear that. Well, yes, Judge, with the Brady argument, just one last thing. It's not as sufficient as a matter of law, as incredible as a matter of law. It's that the evidence, when looked at through the lens of Ms. Pasha, doesn't meet a sufficiency argument. But if the Court's interested in hearing about the Brady argument, I think that is telling. Because Judge Kessler made, at JA 159, she made some very interesting findings about the Brady. She said it's very clear that it's exculpatory. It's very clear that it was suppressed. And she said- That's what she said initially. That was before. That was her evaluation at the outset. I agree. It's there. It's black and white. But by the time she had to make the ultimate ruling, she had other information. She did. And she gave two reasons for that. She said- First of all, she said all the other evidence upon which the Court relied in its final verdict was one reason she gave for why there was no prejudice here. And again, it brings me back to my sufficiency argument. If you look at the evidence with respect to my client specifically, there is not a ton of other evidence against her. This case, with respect to Daya Pasha, was on the razor's edge, at the very least. And it was the testimony of one individual who said it was a young woman and a man was present, very easily could have pushed that over the edge, or at least there's a reasonable probability that it could have done so. From who? Pardon me? Who was going to push it over the edge? You mean- Well, that would be the finer fact, the district court judge to reach- But whose testimony was going to push it over the edge? Oh, Everett Montgomery, Your Honor. His testimony was going to push it over the edge. Well, I would like to cross-examine him. That's an easy one, right? Right. I mean, if that's your argument, that his testimony is going to push it over the edge- Well, my argument- I mean, the trial counsel realized the problems here and tried to strike a deal, no cross-examination. That was a clever move. Yeah, put him on, but no cross-examination. Why do you think that he didn't want him cross-examined? Well, I submit it's because the government, his memory had eroded over the eight-month period because the government's delay in disclosing what was very clearly exculpatory evidence with respect to my client. He, Mr. Montgomery himself, submitted an affidavit where he said if he had asked me a year ago- I find it really hard to believe that you would put somebody like Mr. Montgomery on the stand. He's not a credible witness. Right. The evidence is overwhelming. It's not. He got lots of testimony that he was inebriated at the time, wasn't there. It's just not- With respect to the evidence against my client was hardly overwhelming. It was very thin. And I submit it was insufficient. If the court disagrees with me on that, it's at least a very close call. Yeah. And something like this could easily have tipped the balance one way or the other. Okay. Maybe so. All right. Thank you. Thank you, Your Honor. All right. Counsel for the government? Good afternoon. May it please the court, I'm Kirby Heller for the government. Let me start with the waiver of the jury trial as to the defendant. Not only was there no red flag in this case, as the court has noted in its questioning, there were many circumstances that would give the court confidence that these were knowing, voluntary, and intelligent waivers. There was a full written waiver. There was a colloquy in court in which there was a defense counsel representative that there had been a lot of discussion among all the defendants and their counsel. They were fulsome discussions, and they prepared to waive their jury trial right. But because they were springing it really for the first time in front of the court and the government, it wasn't going to happen then because the government was going to have to go back and think about it, which it did, and then consented as well. In addition, of course, we have... But isn't it right that... The colloquy doesn't take much, right? I mean, it's why we urge district court judges to do it all the time. It certainly doesn't take much, and I think it was an oversight by the court because the court later said in its verdict that it accepted the waivers on the day that this status... Why do we encourage judges to do that? Why is it a best practice? Why does the case law suggest that it's something they should do? Why? Why is that? Well, an oral colloquy will... Sometimes there are no written waivers. The question is a constitutional question whether they voluntarily and intelligently... Isn't it to ferret out the very problem that's being identified now? You're right, Your Honor. And the failure to ferret that out, why isn't that a structural problem here? It's certainly the better practice. It's not required, and even in the Seventh Circuit, which has the supervisory role... We're talking about better practices on constitutional issues. That has some resonance, doesn't it? Well, except the question is in a constitutional sense whether this was a knowing and voluntary waiver, and the court looks at the totality of the circumstances. Let me ask you your reference. You said the district court acknowledged at some point it was an oversight not to have conducted a colloquy. Where did the district... No, I didn't mean to... I'm sorry, Your Honor. I didn't mean to suggest that what I said was an oversight. The district court, in its written verdict, said I accepted the waivers, and so I interpreted that as the court thought it did. Well, I didn't see that, and I didn't see it in anyone's brief either. But let me ask you, suppose hypothetically we had a case of a certifiably committable defendant who, to the average person, appears perfectly normal and can answer simple questions. And a colloquy, which everybody thinks is going to be the cure-all here, I wonder about that. The judge says to the defendant, Are you sure you really want to waive your jury trial? The defendant says, Yes, Your Honor. She says, Have you discussed this with your attorney? Yes. Are you satisfied with your attorney's representation? Yes. Then what? So my hypothetical is you have this certifiable person. Does the government's position change any in that type of situation? Well, again, if something has come before the court, nothing's come before the court. No. I'm saying that at the time this court looks, there's been no post-judgment motion. The district court is totally oblivious to any concern. It isn't until we get to the court of appeals that we hear about this. Well, our position is it would be reviewed for plain error. That's the first thing. And so under the first prong of plain error was there error. And, again, let's assume that there was error because somehow there wasn't enough on the record to satisfy the judge. I'm not sure there was under your hypothetical. Well, under my hypothetical I was trying to come up with a situation where it's perfectly obvious there's a problem, but that would be fact-finding by this court at a minimum unless we remanded it to the district court for the purpose of making a further inquiry. And certainly the court could do that. But in your hypothetical, because it is reviewed for plain error, it's going to be up to the defendant to satisfy the burden of showing the error that is plain and, most significantly, the third prong that it affected substantial rights. So on the first prong, is it the government's position then it is appropriate for the appellate court to look at what is in the record to determine whether or not there was some reason for the district court to have inquired further? No, I think our position would be a remand would be appropriate in that circumstance. Well, then a remand in every circumstance? Well, if there's two things. One is, of course, if it's unclear on the record, and this court is not satisfied that the district court had a satisfactory basis for accepting the waiver, the court should remand. And that's David, in fact. What the court said in David is, of course, there were indications of the record in David, but what the court said is we're not saying it's not voluntary. What we're saying is we're not sure that the district court did not have a sufficient basis. We're not sure whether the district court had a sufficient basis. We're going to remand. Well, in fact, I'm sorry, it didn't remand it because of the difficulty in resurrecting what happened. But one could remand if it was close in time, certainly. So what would the government's position be on counsel's argument here, then, that counsel says the implication of the argument on behalf of her client is not that there must be a colloquy in every case, but that at the point when the appellate court has some information, then, following up on Judge Wilkins' point, the court may find itself looking at the case again. Well, we don't believe that this case comes even close to the hypothetical that Your Honor was positing. In this case, we have just a variety of circumstances that certainly show that this was a knowing waiver. And I just want to point out that we had a four-week bench trial. The case was on the docket for two years. And Mr. Down was in front of the court for, one has to assume, all of those court proceedings. At no time did anything come up to suggest that because of the material in the sealed appendix, which, by the way, does not show, I believe, mental illness, that there was any question about Mr. Down's confidence to waive his right to a jury trial. And I should point out, even at sentencing, after this material had been disclosed, it's not discussed in the sentencing itself. The only health issue discussed at sentencing is Mr. Down's casemaker. Can I ask you a question? I think it was Mr. Allen's point about the insufficiency of the evidence against Daya Pasha. In your view, what is the evidence against her that links her to the conspiracy that we ought to credit? Well, again, of course, this is a sufficiency claim. Let me put it. Besides, was there evidence besides what Jerome and Candace offered about her being at the photo shoot? Let's put that to one side. And what else is there? Well, as to corroborating Jerome's identification, he identified Daya Pasha from a photo spread about a year after the photo shoot. He picked her out from her photo spread as one of the investigators, the mother of the two. That's very strong evidence corroborating his oral identification of Daya Pasha. In addition, what we have really is fairly overwhelming evidence that the two people who were involved in the photo shoot, who brought the props and took the photos and instructed Jerome to be cutting up soap, were Down's investigators. We have that from all three witnesses, including the witness who didn't identify Daya. And we have that corroborated by the phone conversations. There are at least three or four phone conversations where they talk about the Down's investigators doing what they had to do. Who was involved in the phone conversations? I'm sorry? Who was involved in the phone conversations? It was Candace Robertson with Delante White and Brittany McDaniels, also with Delante White. And then we have evidence that shows that Daya Pasha was one of Down's investigators. So, for example, Mr. Down's secretary said that the two Pashas were the only investigators at the time. And although she didn't remember Daya Pasha being involved early on, of course, the photo shoot took place right before the trial. That wasn't early on. But she did say that they were the only two investigators at the time. Similarly, the paralegal working for Mr. Down talked about how he interacted with the two of them over the staged photos. He had both Pashas' names in his cell phone. We have Daya Pasha going with Mr. Down to inspect the evidence. That's not incriminating, but it shows that she's one of the investigators working on the case. That's all I'm saying. That's what I'm trying to find is the incriminating evidence here. Well, the incriminating evidence is the testimony of Robertson and Jerome White, who say these two, Daya Pasha and Aman Pasha, were the Down's investigators who set up this photo shoot. If the evidence is sufficient to show that they were the ones who were there, then we would submit that the evidence is certainly sufficient to show that they were here. And they knew the purpose? It's a reasonable inference they knew the purpose of the shoot? Absolutely. Absolutely. I think there is nothing innocent about what was going on there. They were having somebody. They came in with all these props. They brought the duplicate items, and they brought the balloons. No, no. None of that shows anything. I mean, in this sense, it's the duplication of the items and the fact that, is it Daya who went to the U.S. Attorney's Office to take a photograph of the items that had been seized? I'm just citing that evidence to show she was working on the case. The incriminating evidence. I don't think she's denying that she was an investigator, all right, and that her daughter was also an investigator. On this case. And they worked for Attorney Downe. I don't think that's the issue. Well, I think certainly under sufficiency claim that the court could reasonably, a reasonable fact finder could infer. Did Mr. Downe use other investigators besides the Poshas? He had. He mostly used them. At this particular time, it didn't appear that there was anyone else working for him. As the Secretary said, they were the only two working at the time. Okay. Let me ask you about the Brady issue. This is really troubling, right, I mean, what the government has done here. Why shouldn't we, when we meet this sort of misconduct, say that it just is a game changer? Sorry, government, you act that way and that's the end of it, right? Well, is Your Honor asking whether? I'm asking you to defend the result in light of the clear Brady violation. Well, it's our position that there wasn't a Brady violation. Of course, a Brady violation means that there was exculpatory evidence. I'm sorry, that there was evidence withheld from the opposing side. That should have been turned over. It should have been. Under Brady. Yeah, yeah. You're going to say it was no requirement. It's exculpatory. One gets to the second question, was it suppressed? It wasn't turned over immediately, but it was turned over in time. A month before trial. A month before trial. Long after the defendants have strategized on their defense, done their investigation, interviewed their potential witnesses, and the prosecutor knows this. Well, a month before. So why wasn't it turned over? It was an oversight. Well, that's always. I need a little more than that. The best I could come up with was that trial prosecutors are busy. They have a lot of cases. Maybe this particular prosecutor hadn't started to focus on trial preparation until a month before the trial date. But then I thought, there have been all these preceding events. So the prosecutor had focused on the case before then. It's not as though he was or she, I can't remember, was newly assigned to the case. No, I think that they had certainly started trial preparation and focusing. But why wasn't it turned over? The only thing that I think is in the record is that the prosecutor really didn't realize it was there as soon as he was going. No, the prosecutor didn't say that. The prosecutor says, I didn't believe him. Yes. So we didn't talk to him anymore. Yes. That's absolutely wrong. Right. Well, that's true, Your Honor. But I don't believe that was the reason for not turning it over, that we didn't believe him. The prosecutor acknowledged that it was expulsory and apologized for not turning it over sooner. I believe he did say it was an oversight. And once he saw it and realized it and realized the force of it. Well, I think that the best we could say is that the prosecutor didn't think about his or her Brady obligations. And therefore, we need to do something to make them think about their Brady obligations. I wouldn't say that the prosecutor didn't think of his Brady obligations. He had been in a constant. Well, then it's even worse. It wasn't a Brady violation. Right. If he had thought about his Brady obligations and didn't turn it over, that's even worse, right? Well, as to this piece of evidence, as soon as he saw it and realized what this witness had said, he did turn it over. Is that right? As soon as he saw it, I thought that it was months had passed from when he took the statement until when he disclosed it. So that's true. That is true. That is true. So what you just said is not true. Well. As soon as he saw it, he did not turn it over. As soon as he saw it, he put it somewhere else. And only a month before trial did he do it. Now, I hope you haven't been asked to come by the government and defend that behavior because it's indefensible. Absolutely, Your Honor. And the only question is, at least in this judge's mind, is it so indefensible that it overturns the decision of the district court? And it's a close call in this judge's mind. Well, let me address both those points. We're not defending it. The prosecutor at the district court didn't defend it. He apologized. He was sorry. He realized he should have turned it over. We're not defending it. Now we're addressing the legal issue about what are the implications for the delayed disclosure, not the suppression, on the convictions in this case. But no one is saying that's fine, you know, you can turn it over when you decide you want to turn it over. And I should point out, not that good faith or bad faith determines whether there's a Brady violation, but the district court did say that there was no bad faith. So it wasn't that the government was ---- I don't think that the district court said that. The district court said, I don't have to determine one way or the other whether there's bad faith. I believe the district court did make a finding, Your Honor, that there was not a finding but mentioned that there was no bad faith. I think she said something like, let me be clear, I'm not saying that there was bad faith here. Yeah, yeah. And I'm not sure any Brady. We can quibble on that. But the point is that there was a specific Brady demand that was made before this information was discovered by the government. As the district court said, it's clear that this is exculpatory, at least as to Daya Posh, but probably as to both of them. And it needs to be turned over in time to be meaningfully used by the defense. Eight months passed before it's turned over. And in that time, memories fade. So make your case as to why it was still able to be meaningfully used by the defense, given kind of how everything transpires after that, after the disclosure is made and the witness is kind of all over the place and says, I would have been able to tell you more if you had talked to me sooner. Certainly, Your Honor. First of all, the witness was interviewed by the government three years after the event in question. And then the information is turned over nine months later. So to say that the evidence was fresh in the witness's mind after three years, but that this nine-month period was the critical memory losing time, is really not a very credible argument. But that's not the government's judgment to make. Well, that's true. I mean, the government should have turned it over. But I'm saying if we're trying to figure out what the prejudice is, the issue is this witness was available to testify. And what was important about his memory was what he was going to stay on the stand. They called him. They subpoenaed him. He was offered an opening statement by, I believe, Daya Pasha's attorney. I'm not sure, actually. One of the Pashas' attorneys. I must have been Daya. That he was going to be called. And then, as Judge Clifford said, they decided not to call him once the court said, I'm not going to keep the government from cross-examining him. The fact is that he did have a bunch of inconsistent statements, and he wouldn't have been the witness that turned the tide in a Brady evaluation. The court has to look about whether there's a reasonable probability that the testimony would have affected the outcome. And we say, in this case, there isn't. Not only because of the evidence that was there already, but because he wasn't a credible witness. They never asked for a continuance if they needed more time to look for other witnesses or evidence based on this information. None of that happened. They had a month, basically, after they got this information. And what of the witness's statement that his memory would have been better nine months earlier? Well, yes, and we believe that if he had testified, that statement could have been impeached as well, given that within the period of about a week, he told at least three different versions. But that was after the nine months had passed. That was after the nine. It could have been that when the government first found out about the witness, the defense could have gotten a lengthy statement from him, and then the government could have gotten a lengthy statement from him, and both statements would have been consistent and exculpatory. They wouldn't have been admissible, though. The prior statements of identification are admissible. Coming in just for the identification. Yes, so just like you said, you know, it corroborated Jerome White that he made the prior out-of-court identification. He would have been able to be corroborated by his prior out-of-court identification in the sense that he gave a description. Those descriptions come in all the time, every day. Well, this wasn't an identification. It was going to be a statement that it was a man and a woman. That's a description. That comes in. In bank robbery cases, in armed robberies, anything. What did the guy look like? He had on a mask. Right. What did they tell you that day? Well, he had on a mask. That comes in every day. That's a description. That's substantive evidence. Well, even if that came in, Your Honor, and I'm not sure whether there would have been a dispute about that, we don't believe that there's a reasonable probability that that would have affected the outcome. Again. Why not? Why not? For a variety of reasons. One is, of course, that he's told four different stories, so he'd certainly be impeached. When did he tell four different stories? He told four different stories nine months later. Three years and nine months later. But nine months after or eight months after he had taken a stand that was exculpatory. I don't think that's a strong argument for you. I mean, that sort of, in my mind, sort of proves the point of the danger of what's taking place here. Down the road, afterwards, his memory has faded. That makes the case for the defendants all the more that perhaps what the government did here was so fundamentally wrong that it's like spoilation of evidence, right? How can we rely on it? Well, again, Your Honor, what was going to matter is what he was going to say in court. And they didn't call him. He was available. They didn't call him. In addition, no other witness, and this is the testimony that the district court relies on, no other witness said that there's a man there. It was always two women. But even if his version was two women, his description of the two women does not inculpate Daya because she didn't match the description of the two women, right? So if it's a man and a young woman, that's not Daya. If it's two women who were in their 30s and 40s, that's not Daya. So either way, it's exculpatory as to Daya, right? It's exculpatory because he said a man and a woman. Whether if he said two women and he gave this description, I'm not sure. Isn't that what he said? I mean, it's in the record. That's what I read the record to be. Are you telling me that the record, my reading of the record is wrong? No, not at all, Your Honor. I'm saying that he said both his statement in July, the statement that was in July 2011, the one that was three years after the event, that was a man and a woman. Okay, and when he says it's two women, are you saying that that was also inculpatory of Daya or exculpatory? No, I think it's neutral, really. It's two women. And he described an age. Ms. Witherspoon represented on the record that it was 35 to 45, and then there was some dispute about that, and the prosecutor agreed, yeah, mid-30s to mid-40s. Right. Is that what the record says? Yes, that's what the record says, Your Honor. And isn't in the record also what Daya's age is? Yes, although, again, we don't know how she looked or how good this witness was at identifying ages. For the jury. I'm sorry? For the jury, right? For the fact finder, yes. And so what you're saying, we have to find that there is a reasonable probability of a different outcome. That's correct, Your Honor. And isn't it also from Kyle's view, Whitley, that the question is not whether the defendant was more likely to not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence? Absolutely, Your Honor. And we believe that we have that here, given all the evidence, and the district court's findings here about the evidence that it had to establish that it was these two defendants, Daya Pasha and Imam Pasha, who were the investigators who staged the photo shoot. If it's a close case, doesn't the government lose the tie, because the government was the one to prevent us from figuring out how things would have been done differently because you withheld the evidence for nine months? Well, I think the question, again, under Brady is the reasonable probability. So I don't think it's whether we have the burden, whether we have established that. And I believe in this case that we have established that, given the fact that no other testimony says that it's a man and a woman, the fact that this was a witness who gave many inconsistent statements, and the fact that all the other evidence shows that it was not only two women, but it was also Downs investigators, and there was no evidence of a male investigator at the time. Well, you had the – what did you call him? Not the intern, but – I'm sorry, Your Honor? There was another person on the case who worked for Mr. Downs, the intern. Oh, the paralegal. Paralegal. Yeah, there was no evidence that he was involved. He was a man. He said he went to the photo shoot. He saw the photos. Well, that was evidence that he went to the photo shoot. Yes. That he saw the photos afterwards? No. Couldn't Daya Pasha's lawyer have put that evidence in and then argued that, well, maybe there was a photo shoot, but it was a man and a woman. And the man was this guy, and we know that this guy worked on the case. We know that this guy worked for Downs. That's reasonable doubt. Well, they could have, but they didn't. He was their witness, and they didn't – there was no testimony to that effect. But, I mean, you're arguing that, basically, there was nothing that could have been done with that evidence, and there's clearly something that could have been done with it. There could have been, and they certainly – the defendants could have asked for a continuance if they thought they needed to go explore it. But as to this paralegal, they obviously had found him because they'd called him as a witness. So that evidence could have come out, did come out the way it did. My time is up. Anything further? Well, Your Honor, I don't want to address issues that haven't been addressed. All right, that's fine. I mean, the other two issues are plain error issues that have been argued in the briefs. Is there anything you want to supplement? Well, just that there was no error at all. Well, that's in your brief. We'll rely on it. Let me ask you one more question about the Brady issue. The record is a little clear, but I think the record shows that the government waits eight months, nine months, whatever it is, to disclose this witness to the defense. The defense government offers to help make him available for an interview. The defense says, no, we don't want you doing anything. That's correct, Your Honor. We'll find him. We'll talk to him. That's correct. It appears that the government went back and talked to the witness again before the defense got to him. Is that what happened? That's not my recollection of the timetable. My recollection is that on April 5th, the month before trial in 2012, the information was disclosed. On April 10th, the defendants, some member of the defense team, interviewed the witness for the first time. On April 11th, the government interviewed him and talked about what the witness had seen, and then the defense interviewed him two times thereafter, and the government interviewed him one time thereafter. So I believe the defense interviewed him after the information was disclosed. It was the defense that interviewed him first. All right. Thank you. Thank you. All right. Counsel for Pellant Dome. Thank you, Your Honors. I just have a couple brief points I'd like to address. And the first is that to address Judge Roger's question about whether we raised the obstruction of justice and subordination of perjury before the district court. I saw your footnotes, but that's all you argued. I'm sorry, what? I saw the footnotes in your brief by pleading not guilty, and that's the way you preserved the error. Your Honor, it's also true that the first time we had notice of the district court's application of law, and this case was in the verdict. So this is really our first meaningful opportunity to get review of that, and we think because of that. You couldn't file a motion in the district court? Under Rule 51B, I don't think that's required, Your Honor. I've seen no case. I didn't say required. You said this was the only opportunity, and I asked you whether you could have filed a motion in the district court. That's all. We haven't, no, Your Honor. Yes. It's not your only opportunity. But these are questions of pure law. They're statutory interpretation issues that are properly before this court in a de novo review. Rule 51B states that if there's no opportunity to object below, there's no prejudice to the standard of review. That's been interpreted in Puckett in the Supreme Court as a contemporaneous objection rule. And there's certainly no law in this circuit stating that after a criminal bench trial, a defendant needs to file a post-trial pleading to preserve review of the legal issues in that case. And I wanted to just say briefly, with respect to the obstruction of justice argument, at least four circuit courts have held that for a defendant to act corruptly, his actions must be prompted by a corrupt motive. So even if you apply a plain error review for this, there's an absolutely clear legal norm that every word in the statute has to be given meaning, and the only courts that have done that, that have given some meaning to the word corruptly, have held that it requires an inquiry into the defendant's motive. Same thing with subordination of perjury. Willfully, at its core, requires an action taken of one's own free will. The district court here gave no meaning to the word willfully. It made no findings on Mr. Dahm's willfulness. And at minimum, it should be remanded on that issue. And the final point I want to make is a back-to-the-jury waiver issue. Now, this court has said that there were no red flags before the district court, but there were no red flags because the questions weren't asked. A simple question about, are you taking any medication today, would have resulted in that red flag that this court is looking for. I think the value of finality shouldn't be placed above the value of upholding constitutional rights. So you're back to it's a sua sponde obligation on the district court to make the inquiry. It's undeniably the responsibility of the district court to evaluate whether a defendant can competently make the decision to waive his jury trial. Yes, Your Honor. All right. Thank you. Thank you. All right. Counsel for Appellant Daya Pasha. I'll give you a minute if you want it. Thank you, Your Honor. I'd just like to make two points. One is that what the exchange showed to me was that the sufficiency and the Brady issues come together because the government's argument is you should ignore the Brady violation because there was overwhelming evidence on the record about Daya Pasha. And I submit that if you look at the evidence with respect to the evidence against her specifically, there is not overwhelming evidence. There is hardly any evidence that goes to Daya specifically. The government says, well, there's vague mentions of investigators. There are other individuals involved in this case, including other investigators. There's a woman who gets a lot of play in the government's brief, a woman by the name of Tiffany Archer. The government discusses it, pages 13 and 15 of its brief, who was involved in the Delante White case and participated in a number of activities in the case. So there are other investigators that Mr. Dahm had. Judge Wilkins, to respond to your point, yes, the same day that the judge, the district court below found a Brady violation but withheld ruling on the verdict, later that day government investigators went and interviewed or attempted to interview Mr. Montgomery. That's at JA 846. The only points I had, Your Honor. Thank you. All right. Counsel for Anand Pasha? A minute if you want it. Thank you, Your Honor. Just two quick points. One, again, on the timeline on the Brady issue, as counsel for the government indicated, the government's second interrogation of Mr. Montgomery occurred the day after the defense interview, but that was after the defense explicitly asked for no more help in finding him. That's the first time the inconsistency occurs. We would submit when this court thinks about reasonable probability. Say that again so I'm clear on what your position is. Certainly. The statement is disclosed to the defense on April 5th. The defense on that day asked for no help in finding Mr. Montgomery. The government had provided an out-of-date address for him. The defense located Mr. Montgomery on April 10th. The government had continued its own efforts to locate him, located him on April 11th the next day, and that's the first time that an inconsistent statement occurs. So Mr. Montgomery was consistent for nine months from his first interview with the government to his first interview with the defense, and then when he's approached by the government is the first time he wavers. We would submit when this court's looking at reasonable probability of whether the statement would have made a difference, the right statement to look at is that statement nine months earlier. The inconsistent we would submit occurs partially because of the delay and it's something that's impossible to sort out the cause and effect once that delay has occurred. Thank you. We'll take the case under advisement.
judges: Rogers, Griffith, Wilkins